```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION

Richard P. Hodge,              :

       Plaintiff,              :

     v.                        :       Case No.  2:14-cv-1771

                               :       JUDGE GREGORY L. FROST
Commissioner of Social Security,       Magistrate Judge Kemp

       Defendant.              :
```

REPORT AND RECOMMENDATION

I. Introduction

Plaintiff, Richard P. Hodge, filed this action seeking review of a decision of the Commissioner of Social Security denying his applications for social security disability benefits and supplemental security income. Those applications were filed on May 18, 2011, and alleged that Plaintiff became disabled on June 30, 2010.

After initial administrative denials of his claim, Plaintiff was given a hearing before an Administrative Law Judge on January 29, 2013. In a decision dated February 15, 2013, the ALJ denied benefits. That became the Commissioner's final decision on August 5, 2014, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on December 8, 2014. Plaintiff filed his statement of specific errors on January 7, 2015, to which the Commissioner responded on February 25, 2015. Plaintiff filed a reply brief on March 16, 2015, and the case is now ready to decide.

II. The Lay Testimony at the Administrative Hearing

Plaintiff, who was 51 years old at the time of the administrative hearings and who has a ninth grade education,

testified as follows. His testimony appears at pages 51-59 of the administrative record.

Plaintiff was first asked about his reading and math abilities. He could not read a newspaper but could count change at a store. He did not have a checkbook or a drivers' license. Going back to 1996, he had done only spot labor through temporary employment services. He had not worked since June of 2010.

As far as medical conditions are concerned, Plaintiff testified to back pain which limited his ability to walk, stand, and sit. He could walk two blocks, stand about thirty minutes, and sit about the same amount of time. He was able to lift 25 pounds and could climb stairs with difficulty. However, he could not bend over to touch his toes, and he had some balance issues.

Plaintiff said that sometimes he did not understand things he watched on television. He could take care of his personal needs and had no trouble being around people. He took Advil for his back pain, with varying results. He could not afford any prescription medication. He did not see a doctor regularly for the same reason.

### III.  The Medical and Educational Records

The medical records in this case are found beginning on page 239 of the administrative record. The pertinent records can be summarized as follows.

Plaintiff was seen by Dr. Grodner on July 21, 2011, for a consultative physical examination. Plaintiff reported suffering from back pain radiating into both legs and feet. He could walk a half block at a normal pace and could stand for 15-20 minutes. He could sit but had to change positions frequently. He did not take any medications. He had been treated in the past for both alcohol and cocaine abuse. Examination showed him to walk with a normal gait and to be able to heel and toe walk without difficulty. He had some decreased range of motion of the lumbar

spine and increased tenderness to palpation.  Straight leg raising was negative.  X-rays of the back were normal.  Dr. Grodner thought that Plaintiff would have some difficulty with prolonged weight-bearing activities such as walking, standing, climbing, kneeling, bending, and lifting.  He also said that Plaintiff "could perform some type of sedentary or light activity."  (Tr. 240-42).

Dr. Reece, a psychologist, saw Plaintiff on July 25, 2011 for a consultative psychological examination.  Plaintiff reported an inability to read and some level of depression.  His mother had also suffered from depression.  Plaintiff told Dr. Reece that he had been in special education classes beginning in the sixth grade and that he had some behavioral problems.  He had been arrested on multiple occasions as an adult and had some issues with both his neighbors and with authority.  He had not used cocaine for several years but was still drinking heavily.  That had caused him to lose his last job.  He spent his days watching televison and drinking, and did not socialize or have hobbies. Dr. Reece observed that Plaintiff had a constricted to reactive affect and his prevailing mood was mildly anxious and euthymic. He reported crying spells and feelings of hopelessness, helplessness, and guilt.  He also described mood swings and anxiety.  According to the narrative portion of Dr. Reece's report, Plaintiff's full-scale IQ was measured at 66, with his lowest subtest score being a 62 on processing speed; however, when he listed the test results, they showed a score of 56 in verbal comprehension and a full-scale IQ of 59.  Dr. Reece diagnosed alcohol dependence, cocaine abuse in remission, a depressive disorder, and borderline intellectual functioning.  He rated Plaintiff's GAF at 58, and said that Plaintiff's history "does not support an impression of mild mental retardation."  Dr. Reece thought Plaintiff could follow directions, concentrate

-3-

satisfactorily, had problems getting along with others, and would have some problems dealing with workplace stress. (Tr. 248-52).

The balance of the medical records consist of Plaintiff's medical file from the Department of Rehabilitation and Correction. He was incarcerated in the late 1990s. The records show that he was treated for dysthymia at that time.

There were also evaluations done by state agency reviewers. They indicate diagnoses of degenerative disorder of the back, substance abuse, and borderline intellectual functioning. Dr. Percenevich thought Plaintiff could do a full range of light work. Dr. Voyten, a psychologist, viewed Plaintiff as moderately limited in his ability to deal with normal work stress or to interact with others as well as to adapt to changes in the work setting. (Tr. 101-07). Subsequent state agency reviewers, Drs. Goldsmith and Morton, concurred. No state agency reviewer found that Plaintiff had an impairment severe enough to satisfy any section of the Listing of Impairments.

Plaintiff's school records appear at pages 232-34 of the record. They are almost illegible. However, the ALJ read them as showing that Plaintiff's IQ score was 67 at age six or seven and 70 or 71 when he was 13 or 14, and that they indicated chronic absenteeism.

### IV. The Vocational Testimony

Lynn Kaufman was the vocational expert in this case. Her testimony begins at page 59 of the administrative record.

Ms. Kaufman first testified that Plaintiff had no past relevant work. The most he had earned in any one year was $4,800, and that was in 2006.

Ms. Kaufman was then asked some questions about a hypothetical person of Plaintiff's age, education, and work experience who could work at the light exertional level and who was limited to the performance of simple, routine, repetitive

tasks with no strict time production demands and with only occasional and superficial contact with supervisors, coworkers, and the general public. Also, the work environment had to be relatively static with static work processes and procedures. In response, she identified a number of jobs such a person could do, including cleaner, packer, and sorter.

Ms. Kaufman was next asked about someone who had the same limitations but also would have to be close to public transportation, could not use bilateral foot controls, and needed all instructions to be given orally rather than in writing. She said the person could still do most of the cleaning jobs but only about half of the packing and sorting jobs.

Finally, the ALJ asked Ms. Kaufman about someone who was generally limited as he previously described but who could lift 25 pounds and needed a sit/stand option with neither sitting nor standing exceeding four hours, and not exceeding 30 minutes at a time. She testified that some packing positions would accommodate those restrictions, as would some sorter and assembler jobs. If the same person could lift and carry only eight pounds occasionally, that would eliminate any light jobs.

  V.  <u>The Administrative Law Judge's Decision</u>

The Administrative Law Judge's decision appears at pages 23-41 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2010. Next, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his application date of June 30, 2010. Going to the second step of the sequential evaluation process, the ALJ concluded that Plaintiff had severe impairments including low back pain, obesity, borderline intellectual functioning, an affective

-5-

disorder, alcohol dependence, and a history of cocaine abuse. The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the light exertional levels but that he was limited to the performance of simple, routine, repetitive tasks with no strict time production demands and with only occasional and superficial contact with supervisors, coworkers, and the general public.  Also, the work environment had to be relatively static with static work processes and procedures, any instructions had to be given orally, and the job had to be close to public transportation.  The ALJ next concluded that Plaintiff had a limited education and had no past relevant work.  However, the ALJ found that Plaintiff could do certain jobs identified by the vocational expert, including cleaner, packer, and sorter. The ALJ further found that such jobs existed in significant numbers in the regional economy (there were 4,350 of them). Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

## VI.  Plaintiff's Statement of Specific Errors

In his statement of specific errors, Plaintiff raises these issues: (1) the ALJ did not properly evaluate the question of whether Plaintiff's impairments satisfied Section 12.05 of the Listing of Impairments; and (2) the ALJ mischaracterized and misinterpreted the opinion of the consultative medical examiner. These issues are evaluated under the following legal standard.

<u>Standard of Review.</u>  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is

"'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A. Section 12.05

Plaintiff first argues that the ALJ made a number of mistakes in interpreting and applying Section 12.05(C) of the Listing of Impairments. Section 12.05(C) of the Listing of Impairments provides that a claimant is presumptively disabled if (1) the claimant scores between 60 and 70 on a valid IQ test, (2) has another significantly limiting impairment, and (3) meets certain diagnostic criteria for mental retardation, particularly the manifestation of deficits in adaptive functioning prior to age 22. Plaintiff takes issue with the ALJ's refusal to consider his earlier IQ scores and the fact that he was in special education classes as evidence of the manifestation of deficits in

adaptive functioning prior to age 22. He also argues that the ALJ appeared to judge his school records and test scores under an improper legal standard which relates to IQ stabilization.

Plaintiff also raises an issue with the ALJ's consideration of Section 12.05(B). That section is similar to section 12.05(C) but requires only a qualifying IQ score of 59 or less, together with the same need to show deficits in adaptive functioning manifesting themselves prior to age 22. See, e.g., Honaker v. Comm'r of Social Security, 2014 WL 4437275, *4 (S.D. Ohio Sept. 8, 2014). Plaintiff faults the ALJ for failing to notice that several of his IQ scores, as measured by Dr. Reece, fell below that level. He adds to both these arguments an assertion that the ALJ did not properly view his adult activities as showing impaired mental functioning. In response to all of these issues, the Commissioner contends that the record plainly permits an inference that Plaintiff did not (and does not) have deficits in adaptive functioning, so that neither of these sections were satisfied, and that the ALJ "likely" dismissed the IQ scores listed in Dr. Reece's report "as error" because they did not match his narrative, in which he both reported different scores and characterized them as showing only mild impairment. Commissioner's Memorandum, Doc. 15, at 8 n.2.

The ALJ explicitly considered all four subparts of section 12.05 of the Listing of Impairments "[b]ecause of the claimant's IQ scores ...." (Tr. 30). He summarily rejected any claim to disability under subpart (A)(a finding Plaintiff does not dispute). Next, he concluded that subpart (B) had not been satisfied because "there is no evidence documenting a valid verbal, performance, or full scale IQ of 59 or less." Id. Last, as to subpart (C), the ALJ noted that in order to satisfy this section, a claimant must demonstrate "(1) subaverage intellectual functioning, (2) onset before age 22, and (3) adaptive-skills

-8-

limitations...." (Tr. 30). The ALJ concluded that Plaintiff did not satisfy either of the latter two requirements because he had an IQ score of 70 or 71 when he was age 13 or 14 and because his poor academic performance was due to poor attendance and lack of interest in attending school. Additionally, the ALJ found that Plaintiff did not have deficits in adaptive functioning because he was able to care for himself, cook meals, clean, manage his finances, and use public transportation, and because he had a work history involving interaction with others. Any deficits in this area were therefore mild and did not satisfy any portion of section 12.05(C). (Tr. 31).

Plaintiff is clearly correct that the ALJ misstated the record when he said that there was no evidence of a valid IQ score of 59 or less. However, Listing 12.05(B), like section 12.05(C), requires not only qualifying IQ scores but also deficits in adaptive functioning which manifest themselves prior to age 22. Consequently, if the ALJ's determination on that issue is supported by substantial evidence, any error with respect to the IQ scores recorded by Dr. Reece would be harmless.

Plaintiff is also correct that portions of the ALJ's analysis of section 12.05(C) involved applying an incorrect legal standard. Neither that section nor section 12.05(B) requires that the qualifying IQ scores come from tests administered to the claimant before age 22, and an IQ score above the qualifying range does not negate the applicability of the Listing - quite the opposite. "While the claimant *may* use a qualifying IQ score before the age of 22 to demonstrate that his subaverage intellectual functioning initially manifested during his developmental period, see Daniels v. Comm'r of Soc. Sec., 70 Fed.Appx. 868, 873 (6th Cir.2003) (unpublished decision), a claimant is by no means *required* to produce an IQ score obtained prior to age 22." West v. Com'r Social Sec. Admin., 240 Fed.Appx. 692, 698 (6th Cir. July 5, 2007). Consequently, to the

extent that the ALJ's decision suggested that Plaintiff could not show subaverage intellectual functioning because, prior to age 22, he scored 70 or above on an IQ test, that was a clear legal error.

The same can be said for the ALJ's separate analysis of the issue of intellectual functioning as it related to Plaintiff's school records. The deficits in adaptive functioning which can satisfy either subpart (B) or subpart (C) include, among others, deficits in academic performance. As explained by the Court of Appeals,

> The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills. Heller v. Doe, 509 U.S. 312, 329, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 28-29 (3d rev. ed. 1987) ("DSM-III")). To determine the definition of mental retardation under the SSA, it is appropriate to consult leading professional organizations' definitions. See 67 Fed.Reg. 20022 (2002). The American Psychiatric Association defines adaptive-skills limitations as "[c]oncurrent deficits or impairments...in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, *functional academic skills*, work, leisure, health, and safety." DSM-IV-TR at 49.

Hayes v. Comm'r of Social Security, 357 Fed. Appx. 672, 677 (6th Cir. Dec. 18, 2009)(emphasis supplied).

The Court concludes that, despite failing to follow a completely correct pathway of analysis, the ALJ did have substantial support for his finding that Plaintiff did not have deficits in adaptive functioning. Plaintiff's school performance was definitely sub-par, but a reasonable person could have reached the same conclusion as the ALJ about the reasons for that. Absenteeism played a significant role in his poor performance, and that cannot be attributed to any intellectual

-10-

deficits.  In other areas, Plaintiff showed an ability to take care of his personal needs and to relate appropriately to others. His work experience is not determinative on the issue of whether he has deficits in adaptive functioning, but it was legitimately considered.  Moreover, Dr. Reece, who recorded the IQ scores of 59 or below, concluded that Plaintiff did not show evidence of even mild mental retardation, and the state agency reviewers both diagnosed borderline intellectual functioning rather than mental retardation, a diagnosis which, like the Listing, requires evidence of life-long deficits in adaptive functioning.  From all of this evidence, the ALJ could reasonably have concluded that Plaintiff did not satisfy that criterion of either subpart (B) or subpart (C) of section 12.05.  As a result, the Court finds no merit in this first claim of error.

                        B.  <u>The Consultative Examiner's Opinion</u>

Plaintiff's other argument is that the ALJ did not properly evaluate Dr. Grodner's opinion.  He notes that the assessments done by Dr. Grodner and the two agency reviewers differ - Dr. Grodner pointed out some postural restrictions which they did not adopt - but the ALJ appeared not to notice, and did not explain how he reconciled, those differences.  Plaintiff argues that this failure violated the ALJ's duty to resolve such conflicts in the record.  The Commissioner, in turn, claims that although the ALJ adopted Dr. Percenevich's finding that Plaintiff could do a full range of light work with no postural restrictions, "[n]o opinion diverged from these findings."  Doc. 15, at 12.

Here is what the ALJ said on this issue.  First, the ALJ summarized Dr. Grodner's findings (but not his conclusions) and stated that "the evidence reflects that the claimant can perform light work without difficulty with the exertional, postural and environmental limitations set forth above ...."  (Tr. 34).  He then concluded that the physical portion of the residual functional capacity assessment was "generally consistent with the

opinions of the BDD reviewing physicians" and gave their opinions great weight. (Tr. 36). He specifically found their opinions to be consistent with the results of Dr. Grodner's examination, stating that they were "consistent with the opinions of the consultative physician ... who concluded that the claimant is capable of light work, and which are entitled to great weight." (Tr. 36). In the concluding part of his discussion, the ALJ specifically assigned great weight to both sets of opinions (Tr. 36-37). As Plaintiff has pointed out, the ALJ made no explicit mention of any differences among them. He did, however, make a finding that the evidence did not support additional exertional, postural, or environmental limitations beyond those contained in the ALJ's residual functional capacity determination. (Tr. 33).

    Plaintiff is correct that there are some differences between Dr. Grodner's opinion and the opinions of the state agency reviewers, although Dr. Grodner's report is not particularly specific on the issue of postural limitations ("he [Plaintiff] would have some difficulty with activities that require prolonged weight bearing such as ... kneeling [and] bending..."). (Tr. 242). Almost all of the studies Dr. Grodner performed produced normal results, however, (the exception being some range of motion limitations in the lumbar spine) and Dr. Perencevich, the first state agency reviewer, recited those normal results as part of his analysis. (Tr. 101). Dr. Perencevich clearly concluded that the evidence did not justify postural limitations, and that is what the ALJ found as well. Given the findings accompanying Dr. Grodner's report and Dr. Perencevich's analysis and opinion, that is a conclusion which a reasonable person could have reached on the basis of this record. Consequently, the only issue presented is whether the ALJ's failure explicitly to acknowledge and resolve this fairly minor conflict in the evidence is reversible error.

    The Court concludes that it is not. In other similar cases,

the Court has held that while it is definitely the better practice for an ALJ to make an explicit resolution of such conflicts, when the conflicts are between the opinions of non-treating sources and they are relatively minor, the failure to resolve them explicitly is generally harmless error. <u>See Pierce v. Comm'r of Social Security</u>, 2015 WL 6561950 (S.D. Ohio Oct. 30, 2015), <u>adopted and affirmed</u> 2015 WL 7888791 (S.D. Ohio Dec. 4, 2015).  Of course, an ALJ also has no heightened duty to explain why the opinion of a non-treating physician is not given controlling weight, and "the ALJ's failure ... to explain why he disregarded part of the opinion of a consultative examiner does not warrant reversal." <u>Dykes ex rel. Brymer v. Barnhart</u>, 112 Fed.Appx. 463, 468 (6th Cir. Oct. 12, 2004).  Here, given the fact that substantial evidence supports the ALJ's residual functional capacity finding, and the ALJ implicitly resolved conflicts in the medical evidence - a function reserved to the ALJ, <u>see, e.g., Felisky v. Bowen,</u> 35 F.3d 1027, 1036 (6th Cir.1994) - the Court finds no reversible error with respect to this claim.

## VII.  <u>Recommended Decision</u>

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in favor of the Defendant Commissioner of Social Security.

## VIII.  <u>Procedure on Objections</u>

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a <u>de novo</u> determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper

objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation <u>de novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

>                              /s/ Terence P. Kemp
>                              United States Magistrate Judge